IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JAMES CLARK, ) | |
| ) | |
| Plaintiff, ) | 1:20-cv-1332 (LMB/MSN) |
| ) | |
| v. ) | |
| ) | |
| GENERAL INTERNAL MEDICINE ) | |
| GROUP, INC., et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Before the Court is defendants' Motion for Summary Judgment [Dkt. No. 28], which has been fully briefed and argued in open court. For the reasons stated from the bench and in this memorandum opinion, defendants' motion has been GRANTED.

### I. BACKGROUND

**A. Factual Background**

In June of 2014, defendant General Internal Medicine Group, Inc. ("GIMG") hired plaintiff James Clark ("Clark") to work at its Ballston Urgent Care Clinic as a physician assistant. [Dkt. No. 29] at 1-2; [Dkt. No. 23] at ¶ 1. In 2016, defendant Inova Health Care Services ("Inova") acquired GIMG, and the two entities became joint employers of Clark. Id. at ¶ 3-4.

1. <u>Plaintiff's Efforts to Obtain an N95 "Duckbill" Mask</u>

As the medical emergency related to the outbreak of the COVID-19 pandemic began to emerge, on February 11, 2020, the Chief of Clinical Enterprise at Inova, Dr. Stephen Motew, sent an email to all Inova staff, explaining Inova's planned responses to the emerging coronavirus risk, which included a link to an internal website housing supply resources for employees. Def. Ex. C, [Dkt. No. 29-3]. Clark admits he "didn't read the email carefully when it was sent on February 11," and "only really became aware of [the] email and re-read it, ... on Monday February 24th." Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 24:9-13. On February 24, 2020, on his colleague's recommendation, Clark followed the link included in the February 11 email to the internal website to make an appointment to be fit-tested for an N95 mask. Id. at 25:8-21. Clark attended that appointment on February 27, 2020, and was sized for a regular Halyard mask, also known as a "duckbill" mask. Def. Ex. E, [Dkt. No. 29-5]. The individual who fitted Clark for his mask told him that he could "go through [his] supply line" to get duckbill masks, but she did not tell him exactly when a mask would be available through the regular supply line. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 29:18-22.

On the same day, Clark took the form reporting the results of his fitting to his Team Lead, Jason Gibson, and asked if he could get the recommended duckbill mask before his next workday. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 33:2-16. Gibson told Clark that "he had been having some issues getting supplies,"[1] and directed him to speak to Inova's Assistant Vice President and Chief Nursing Officer for Physician Services, Nancy Loeffler. Id.

---

[1] In his deposition, Clark acknowledged that when he was attempting to get a duckbill mask from Inova, he was "aware that there were disruptions in the supply chain globally due to the COVID-19 pandemic," because he "had heard generalized reports of that through the media." Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 33:20-34:2. He declined to speculate on whether the

Clark followed Gibson's recommendation and called Loeffler on the same day. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 39:10-22. According to Clark, he told Loeffler "that basically the reason [he] was calling was to ask for her assistance in helping [him] get [his] halyard regular mask" because he "was going to be seeing patients the next day and that [he] was concerned with community spread already known in the United States, that it was only a matter of time until it came to our door." Id. at 39:14-22. Clark remembers Loeffler as having been "pretty dismissive of [his] request" and not "showing urgency," and that she was "noncommittal" after he "pointedly asked her if she would help [him] get [the mask] by the next day." Id. at 40:8-18. In her deposition, Loeffler described Clark's demeanor during that phone call as "rather aggressive … almost to the point of being belligerent." Def. Ex. F (Loeffler Tr.), [Dkt. No. 29-6] at 19:1-6. Although she acknowledged that Clark did not yell or use profanity, Loeffler explained that he was "raising his voice," "interrupting," and "wanting [her] to answer questions immediately that [she] had no answer to." Id. at 19:7-21. Loeffler did not give Clark a firm answer as to when a duckbill mask would be available, but told him that Inova staff "were working within the confines of what we could get and within our confines of what was being sent to the hospital." Id. at 20:7-10. After her call with Clark, Loeffler promptly emailed an Operations Project Manager in Supply Chain Management, Stacey Barb ("Barb"), asking whether there was a duckbill mask available for Clark. Loeffler forwarded a copy of that email to Clark, writing, "They are working on it." Def. Ex. K, [Dkt. No. 29-11].

At about 10:30 AM on February 28, 2020—the day after Clark was fitted for a mask—he emailed Loeffler asking if she had any update as to when he would receive his mask. Def. Ex. M,

---

global supply chain problems were the reason that Gibson could not immediately get him a duckbill mask. Id. at 34:3-6.

[Dkt. No. 29-13]. Loeffler responded within thirty minutes, explaining that she had "no update yet," but would "keep [Clark] in the loop." Id. In addition, Loeffler sent an email to Clark's direct onsite manager, Kym Manley ("Manley"), to report that she had an "[i]nteresting dialogue last night with James Clark," and asking Manley to call her to discuss that interaction. Def. Ex. L, [Dkt. No. 29-12].

At noon, Clark responded to Loeffler's email to him by chastising Loeffler: "Considering these emails are being sent as high priority, I don't understand why we wouldn't know if we have regular halyard masks by now." Def. Ex. M, [Dkt. No. 29-13]. Manley (Clark's direct onsite supervisor) then called Loeffler as Loeffler had requested, to discuss her "interesting dialogue" with Clark on the previous day. Def. Ex. F (Loeffler Tr.), [Dkt. No. 29-6] at 21:18. Manley testified at her deposition that Clark had been acting "unreasonabl[y]," because "everything that came out he began to question, and he wouldn't give us the opportunity to provide answers, to provide resources[.]" Def. Ex. I (Manley Tr.), [Dkt. No. 29-9] at 47:9-16. Manley described his "demanding behavior" during this time as "unprofessional[][.]". Id. at 92:8-11.

On March 2, 2020, Manley met with Inova Director of Operations Julianne Jeffrey ("Jeffrey") and Inova Director of Human Resources Lowana King ("King) in Manley's office. Def. Ex. A (King Decl.), [Dkt. No. 29-1] at ¶¶ 5-7. During the meeting, Clark knocked on the door, which was closed, and Manley told him, "Come in." Pl. Ex. 5 (King Tr.), [Dkt. No. 31-5] at 22:12-15. In her deposition, King testified that Clark entered the room where the meeting was in progress, "sat down and informed [her] that he heard that [she] was in the building, and he went into how he had ordered the mask, he was waiting, [and he] didn't understand why it was taking so long, and so forth." Id. at 22:15-19. King found Clark's behavior "unprofessional,"

both because "he walked in, sat down, and immediately started stating his concerns, as we were in a meeting already," and because his voice was escalating and he interrupted King "a couple of times" during the conversation. Id. at 23:1-24:13. Despite finding Clark's behavior unprofessional, King reached out to Loeffler to ask about the status of Clark's duckbill mask. Def. Ex. A (King Decl.), [Dkt. No. 29-1] at ¶ 9. Loeffler advised King that efforts remained underway to get Clark his mask, and King passed Loeffler's message on to Clark. Id. at ¶ 10.

The next day, March 3, 2020, Manley emailed Barb, the operations manager in supply chain management, to "check on James Clark['s] N95 and [ ] see if it can be delivered or picked up today." Def. Ex. O, [Dkt. No. 29-15]. Also on March 3, the Ballston Urgent Care Clinic received a shipment of masks that were a different size than the one Clark needed, prompting him to "express[ ] [his] frustration" to office manager Gibson and his direct manager Manley. He also called Loeffler, and he testified at his deposition that although he "remember[s] identifying [him]self politely," Loeffler "cut [him] off and said 'James, I got to go. I have another call," and did not offer to call him back. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 75:12-76:8. In her deposition, Loeffler disputed that she hung up on Clark, and instead testified that she explained to him that she was receiving an urgent call from her supervisor and that she would have to call him back. Def. Ex. F (Loeffler Tr.), [Dkt. No. 29-6] at 53:1-13. Loeffler further testified that she tried to call Clark back, but he was not at work and she left a message for him with Manley. Id. at 54:1-2.

On or about March 3, 2020—while Clark was initially trying to obtain a duckbill mask—he commented to his manager, Manley, that if he had been exposed to COVID-19, "it would be nice to go home for 3 weeks and get paid." Def. Ex. N, [Dkt. No. 29-14] at 1 (Manley email summarizing Clark's statements). During his deposition, Clark acknowledged that he "may have

5

said something like that, but, again, it was in the context of [him] declining to go home" while he waited for the duckbill mask to arrive. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 73:13-22. Clark clarified that actually taking paid time off "wasn't what [he] wanted at that time. What [he] wanted was to get the PPE that [he] had been asking for at that time for a week." Id.

On March 5, 2020—one week after Clark was fitted for a mask—Manley tasked Gibson with driving to the office of the supply chain manager Barb to pick up a box of duckbilled masks that would fit Clark. Def. Ex. I (Manley Tr.), [Dkt. No. 29-9] at 103:1-10. Gibson hand-delivered a box containing between 25 and 50 masks, even though Clark was not at work that day. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 68:9-11; id. at 69:12-16; Def. Ex. N, [Dkt. No. 29-14] at 2.

2. Plaintiff's Interactions with Inova's COVID-19 Coordination Center

In February or March of 2020, Inova established a COVID-19 Coordination Center ("Coordination Center"), a call center that distributed information about COVID-19 to Inova staff and to the public. Def. Ex. P (Ricciardi Tr.), [Dkt. No. 29-16] at 15:3-17. On March 5, 2020, Clark called the Coordination Center. Although he had received his duckbill mask, his call was "about still needing [his] gown and eye protection." Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 78:6-8. The operator asked Clark to send a follow-up email explaining what was needed; instead, Clark called the Coordination Center again on March 6, 2021. A second operator told Clark that gowns and eye protection were not required for outpatient facilities. Id. at 79:1-22. Clark asked the operator to send him the guidelines that she was referencing, and she followed up by sending Clark the "exact guidelines that were on the COVID crisis website at that time, which" he felt "basically confirmed what [he] was saying [all] along that we did need eye protection and gowns." Id. at 80:11-19. Believing himself vindicated by the operator's email, Clark called her back and "confront[ed] her on the fact that the e-mail she had sent" did not have guidelines that differed from what he requested. Id. at 80:20-81:4.

6

On that same day (March 6, 2021), Cheryl Ricciardi ("Ricciardi"), the director of Out-Patient Practices who was working at the Coordination Center, summarized Clark's communications in an email to Manley and Loeffler:

> Hello Kym. I am working in the COVID19 Coordination Center. We received a call from James Clark from the UCC. He express[ed] great concern about not having the proper PPE at the UCC and was insisting that we send more equipment. The supply chain team delivered materials earlier in the week. Please let me know if there is something that is needed. James was not clear but generalized that they have "no equipment[.]"

Def. Ex. R, [Dkt. No. 29-18] at 4. Manley responded by adding Gibson to the email thread and explained that she was in the process of obtaining gowns and eye protection. Id. at 3. Ricciardi replied, describing her second call with Clark in which she sent him guidelines for outpatient facilities dealing with patients who might have been exposed to COVID-19. Id. at 3. Ricciardi next confirmed with Gibson that his facility did not have gowns, eye protection, or face masks, and arranged for those supplies to be delivered to Gibson by the next morning, Saturday, March 7, 2020. Id. at 1.

On March 7, 2020, Clark arrived for work at the facility before the promised delivery of PPE. He asked Manley to call him, and when she did, she explained to Clark that if he did not feel safe at work he could go home. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 87:11-21. Two hours later, the delivery of PPE which Ricciardi had arranged arrived. Id. at 88:5-9. Later that day, Clark updated his Facebook profile picture to a photograph of himself wearing full PPE, including goggles, a gown, and a duckbill mask. Def. Ex. T, [Dkt. No. 29-20].

On Monday, March 9, 2020, Clark called the Coordination Center for the fourth time. Although he acknowledged that he had a "full set of PPE on March 9th," he was calling to "follow-up on the second call from March 6th, where" the operator "insisted that there was these out-patient guidelines." Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 84:1-9. Clark testified that the

operator on March 9—a different individual than the March 6 operator—again tried to tell him there were outpatient guidelines, but was unable to find them and eventually "decided to come clean and said that he was aware that [the March 6 operator] had told [Clark] that these guidelines existed, but he knew that [they] didn't." Id. at 85:4-11. Clark testified that on March 9, he was "not calling to ask for any PPE because [he] already had everything that [he] needed," id. at 85:14-16; however, Ricciardi sent an email on March 9 to Manley and Gibson, in which she informed them that the Coordination Center "received a call ... this morning from James indicating that there were no supplies available at" the facility. Def. Ex. U, [Dkt. No. 29-21].

Separate from the four calls that Clark made to the Coordination Center between March 5 and March 9, another individual working at the call center—Susan Carroll ("Carroll"), a Senior Vice President for support services for Inova's clinical enterprises—testified that Clark called the Coordination Center on two other occasions. Def. Ex. Q (Carroll Tr.), [Dkt. No. 29-17] at 7:16-21, 12:1-13:1. Carroll does not remember the exact dates of the calls. Id. During the second of these calls, Carroll was in the Coordination Center office when an employee approached her and said that she had Clark on hold, because she was "having a hard time communicating with him." Id. at 13:5-13. Carroll took over the call, in which Clark "talked about concerns that he had of whether ... they had the appropriate supply chain, the appropriate protective equipment." Id. at 14:14-19. Carroll attempted to explain to Clark that Inova was following CDC recommendations and had the appropriate equipment, but she "found that conversation to be very difficult," because Clark "interrupted a lot" and was "belligerent in the conversation, argumentative about policies and ... even [about] standard practice that was set by the Center for Disease Control." Id. at 14:20-15:15.

After this conversation, Carroll reported Clark's aggressive behavior to Artur Sivaslian ("Sivaslian"), Inova's Senior Vice President of Surgical Services. Sivaslian passed Carroll's report on to King, the Human Resources Director, and Jeffery, the Director of Operations, and asked that they "look into these issues." Def. Ex. V (Sivaslian Tr.), [Dkt. No. 29] at 18:3-14.

3. <u>Complaints and Reports about Plaintiff's Conduct</u>

On March 9, 2020, Clark's supervisor Manley sent an email to HR Director King, Assistant Vice President Loeffler, and Director of Operations Jeffrey, offering "formal documentation of the series of events that have transpired with James Clark." Def. Ex. N, [Dkt. No. 29-14]. The email described Manley's view that Clark had behaved "unprofessional[ly]" in trying to obtain a duckbill mask; telling Manley that "it would be nice to go home for 3 weeks and get paid"; accusing Loeffler of "hanging up the phone on him and brushing him off"; continuing to call Loeffler and Ricciardi about the lack of PPE even after it had been delivered; and falsely reporting to Ricciardi that there were no PPE supplies available at the clinic. Manley informed King and Jeffrey that "the level of behavior that [Clark] has displayed during such a critical time has created complete chaos from Urgent Care to the Supply Chain … ." <u>Id.</u>

In addition to this email from Manley, Jeffrey and King had also been contacted by Sivaslian, who was Jeffrey's supervisor and who had received the complaints from Carroll about how Clark was treating the Coordination Center staff. Def. Ex. V (Sivaslian Tr.), [Dkt. No. 29-22] at 18:3-14. Jeffrey testified at her deposition that "it was reported by multiple team members within the [Coordination Center] that James Clark, to each and every one of them, was unprofessional, belligerent, and causing chaos at a time when we were trying to maintain chaos [sic] by inaccurate misrepresentation of our PPE." Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 49:16-50:1.

4. <u>Plaintiff's Remarks and Inquiries about Paid Time Off Related to COVID-19</u>

On March 13, 2020, a clinic physician named Matthew Burke ("Burke") emailed clinic employees that a physician's assistant named Anh Le had treated a patient who later tested positive for COVID-19, and that as a result Le would be quarantining for the following 14 days and her shifts would be reassigned. Def. Ex. X, [Dkt. No. 29-24]. Clark responded to this email, stating: "We need good written guidance / reassurance from INOVA regarding how we will be compensated for being home on self-quarantine. Are we going to be paid? Will we have to use our PTO?" Id. Clark also asked whether employees covering shifts for quarantining co-workers would receive incentive pay and warned Dr. Burke that he planned to raise all these questions on a conference call that same day. Id. Clark wrote that he "hope[d] someone from INOVA will be able to provide clear answers to this TODAY." Id. (emphasis in original).

A few hours later, at 2:35 PM on March 13, 2020, Manley sent an email to clinic staff, attaching a document titled "Human Resources COVID-19 Frequently Asked Questions (FAQ)." Def. Ex. Y, [Dkt. No. 29-25]. Under the section header "Compensation," the FAQ answered the question:

> If Inova places me on quarantines [sic], how will I be paid?
> If Inova places a team member on quarantine, the HR business partner will be responsible for entering the paid leave of absence on the timesheet.

Id. at 4.

Clark found the guidance in the FAQ document "pretty vague," because it didn't clarify whether time spent in quarantine would come out of employees' PTO. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 114:19-115:3. To seek clarification, Clark raised the same questions he had expressed in his email to Dr. Burke in a conference call that day with clinic employees and Inova leadership, including Director of Operations Jeffrey. Id. at 115:3-5. According to Clark, he tried

10

three times to get Inova leadership on the call to give him an answer he found satisfactory, but they were unable to do so. Id. at 125:5-8.

### 5. Plaintiff's Unauthorized Documents Relating to Patient Care

On March 12, 2020, a physician at the Ballston Urgent Care Clinic, Dr. Andrew Cureton, sent an email to some members of the clinic staff, including Manley and Clark, with the subject line "Meeting Summary." Def. Ex. Z, [Dkt. No. 29-26]. Cureton's email included a script for front desk workers to use when screening arriving patients for symptoms of COVID-19, which instructed employees to determine whether patients had any travel exposure to certain countries where the coronavirus was especially prevalent. Id. ("If there is an exposure to known laboratory-confirmed COVID-19 case or travel to China, Italy, South Korea, or Japan, give patient a mask and direct them outside stating, 'Please step outside and call the number listed. We'll patch you right back to a provider.'").

A few hours after Cureton sent this email, Clark sent an email to clinic staff with the subject line "Covid Testing," in which he stated that "We don't have to go off the stupid state criteria (known positive test exposure, or international travel) anymore." Def. Ex. AA, [Dkt. No. 29-27]. Clark's email went on to explain that it was now possible for clinic staff to order COVID-19 tests, and how to order and properly code the tests for insurance purposes. Id. Clark testified that he sent this email because he had spent the day calling insurance companies to learn how to acquire COVID-19 tests, and another physician at the clinic, Dr. Lin, told him that he should share what he had learned. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 102:3-105:15. Clark had sent a "rough draft of what [he] wanted to write" to Dr. Lin a few days earlier; however, Dr. Lin did not respond, and Clark acknowledges that neither Dr. Lin nor anyone else at Inova reviewed his March 12 email before he sent it. Id. at 105:16-22.

11

Manley, Clark's supervisor, found it inappropriate for Clark to characterize the state criteria as "stupid" and thought it improper for him to send an email suggesting that staff not follow state criteria, particularly given that he was "not in a supervisory capacity." Def. Ex. I (Manley Tr.), [Dkt. No. 29-9] at 76:18-20, 78:20-79:3. Accordingly, Manley promptly forwarded Clark's March 12 email to Jeffrey and to the Clinic's Lead Physician, Anjali Goyal ("Goyal"). Def. Ex. BB, [Dkt. No. 29-28]. In her email to Jeffrey and Goyal, Manley wrote:

> Who approved for James to send this out as we just had meeting with Dr. Cureton and we I [sic] have provided the both of you on what Dr. Lin has approved for Urgent Care at this time.
>
> James cannot continue to roll out directives on his own when we are rolling out one set of standards and then he sends this to all providers he continues to cause confusion in the practice.

Id.

On March 13, 2020—one day after Manley forwarded Clark's unauthorized email—Manley forwarded Jeffrey a photograph of a printed message that had apparently been sent from Clark's personal email address. The message contained a script for front desk employees to use to respond to questions about COVID-19. Jeffrey considered Clark's document a "violation," because "employees at that level are not entitled to draft a script and hand it out to … team members." Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 42:10, 44:14-16.

At his deposition, Clark explained that he drafted this document after a front desk employee came to him and Cureton to ask for guidance in answering questions from the public about COVID-19 testing. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 89:21-92:5. According to Clark, he and Cureton decided what employees should say, and Cureton "did not feel like typing it up" and asked Clark to do so instead. Id. at 92:3-11. Clark testified that he sent the document to Cureton for his review. Id. Cureton did not reply by email, and Clark is not certain whether he

12

discussed the script with Cureton again, but believed that if they did speak about it, "it would have been the extent of … him thanking [Clark] for writing it up and saying that he agreed that it was a good script." Id. at 92:21-93:4. Clark believes that the script shown in the photograph must have been printed out for the front desk because Cureton reviewed it and approved of it, and therefore he does not believe that the script was "unauthorized." Id. at 93:5-15.

Jeffrey forwarded both Clark's March 12 email and the photograph of the script on the front desk to HR Director Lowana King. Def. Exs. CC, DD [Dkt. Nos. 29-29, 29-30].

6. Plaintiff's Termination

Following these reports, Jeffrey—in consultation with King—decided to terminate Clark's employment. Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 71:4-19; Def. Ex. A (King Decl.), [Dkt. No. 29-1] at ¶ 19. On March 13, 2020, King called Clark to place him on administrative leave "with the purpose of explaining Ms. Jeffrey's and Mr. Silvaslian's concerns and asking for Mr. Clark's perspective." Id. at ¶ 13. When Clark did not answer King's first call, she left a voicemail. Clark called her back that same evening and asked her why he was being placed on leave, to which she responded that the decision was made by Goyal, Lin, and Jeffrey and that he would receive more information later. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 131:9-21.

In her declaration, King asserts that "over the next two weeks, [she] called Mr. Clark multiple times to try to explain the concerns that had been raised regarding his conduct and to understand his perspective. However, [she] was unable to successfully contact Mr. Clark." Def. Ex. A (King Decl.), [Dkt. No. 29-1] at ¶ 16. Clark presented a different account at his deposition, testifying that he did not hear from King for ten days; that when she called, she left a voicemail saying that she would call him the following Monday; and that no one called him the following Monday. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 133:11-134:3. Clark testified that other than

13

the voicemail from King: "There was no interaction from them at all. There was no missed calls [sic]. There was no voicemails [sic]. There was nothing." Id. at 134:4-6.

On April 3, 2020, Inova sent Clark a letter through its Vice President of Practice Operations and Optimization, formally terminating his employment. Def. Ex. GG, [Dkt. No. 29-33]. The letter informed Clark that his termination would be effective 90 days from the date of his receipt of the letter, during which he would remain on administrative leave. The letter advised Clark that "[d]espite numerous efforts, we have been unsuccessful in contacting you by phone." Id.

## B. Procedural History

On September 21, 2020, plaintiff filed this three-count complaint in the Circuit Court of Fairfax County, alleging in Count I, discrimination/retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, et seq.; in Count II, retaliation in violation of Va. Code § 40.1-51.2:1; and in Count III, wrongful termination in violation of Virginia common law. [Dkt. No. 1-1]. Defendants removed this action to federal court and filed a motion to dismiss Count III, following which plaintiff voluntarily dismissed that count. The parties engaged in discovery, defendants filed for summary judgment on Counts I and II, and after oral argument that motion was granted in open court.

## II. DISCUSSION

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be

made in favor of the nonmoving party. Hawkins v. McMillan, 670 F.App'x 167, 168 (4th Cir. 2016).

### B. Analysis

#### 1. Count I (FMLA retaliation)

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the statute. 29 U.S.C. § 2615(a)(2). A plaintiff "must prove three elements to establish a prima facie case of retaliation: (1) '[he] engaged in a protected activity'; (2) '[his] employer took an adverse employment action against [him]'; and (3) 'there was a causal link between the two events.'" Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 429 (4th Cir. 2015) (quoting Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc)). Even after a plaintiff has successfully made out a prima facie claim, "[i]f the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual." Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Defendants argue that summary judgment should be granted as to Count I for two reasons: plaintiff has not shown that he engaged in any protected activity, and even if he had, defendants have established a non-retaliatory reason for his termination which he has not shown to be pretextual.

The FMLA protects the rights of covered employees to take up to 12 workweeks of leave during any 12-month period due to certain family or health-related causes, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1); see also Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006). There is no indication in the record that plaintiff requested or took FMLA leave; in fact, plaintiff was asked directly during his deposition whether at any point he

15

requested leave due to exposure or potential exposure to COVID-19. He clearly responded "I did not" to both questions. Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 117:16-18, 118:2-4. Failure to ask an employer for leave due to a medical condition is fatal to an FMLA case. The Fourth Circuit has held that an employer's "knowledge of [an employee's] medical condition couldn't qualify as a protected activity under the FMLA because [the employee] never asked to take leave due to her condition." Shoemaker v. Alcon Labs., Inc., 741 F. App'x 929, 933 (4th Cir. 2018). Plaintiff's evidence of a protected activity is even flimsier than Shoemaker's, because unlike the unsuccessful plaintiff in Shoemaker, there is no evidence in the record that Clark suffered from a serious medical condition; he merely posited that he could hypothetically contract COVID-19 at some future point.

In his opposition to summary judgment, plaintiff argues that his statement that it would be "nice to stay home and get paid" if he contracted COVID-19 was protected by the FMLA, [Dkt. No. 31] at 24; however, plaintiff admitted in his deposition that he made this statement "in the context of ... declining to go home and be paid," and that going home "wasn't what [he] wanted at the time." Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 73:15-22. Neither expressing that it would be nice to get sick leave in the abstract, nor "declining to go home and be paid" are activities protected under the FMLA. Plaintiff also suggests that his questions during the March 13, 2020 conference call "in which he raised concerns about how he would be compensated if exposed to COVID-19 ... rais[ed] the inference of taking FMLA leave." [Dkt. No. 31] at 25. If this argument were valid it would open the door to an FMLA claim every time an employee asked about their employer's sick leave policies. To the extent plaintiff claims that questions about hypothetical future sick leave "rais[e] the inference of taking FMLA leave," his claim has

16

no statutory or case law support. Nothing in the FMLA points to the broad protections plaintiff seeks.

Even if plaintiff had engaged in protected activity, defendants have offered essentially unrebutted evidence supporting a non-retaliatory basis for his termination. Jeffrey, who made the decision to terminate plaintiff in consultation with King, had received or been forwarded multiple complaints about plaintiff's behavior from multiple individuals, including her own supervisor and plaintiff's direct supervisor. Def. Ex. N, [Dkt. No. 29-14]; Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 49:16-50:1. Jeffrey testified at her deposition that although plaintiff's "concern about COVID was reasonable," his "concerns about lack of PPE were inaccurate," and he "acted very unprofessionally in raising his concerns, and that was consistent right up until the time of his termination." Id. at 38:13-15, 40:18-21. Plaintiff argues that these reasons were pretextual because Jeffrey also testified that plaintiff's "stating that he believed that there was inadequate PPE" "was a factor" in his termination, Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 47:22-48:5; however, plaintiff never argues—nor could he—that making statements about inadequate PPE is a protected activity under the FMLA.

Because plaintiff has neither proven the first element of a prima facie case of retaliation, nor rebutted defendants' legitimate reasons for his termination, summary judgment was granted in defendants' favor on Count I.

2. Count II (Va. Code § 40.1-51.2:1 Retaliation)

Virginia Code § 40.1-51.2:1 provides that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this

title for themselves or others."[2] Defendants do not appear to dispute that Clark's objecting to inadequate PPE during the COVID-19 pandemic might qualify as "fil[ing] a safety or health complaint" for the purposes of the statute; however, they argue that plaintiff cannot prove that his potentially protected activity was the cause of his termination. The Virginia Administrative Code clarifies that a plaintiff proceeding under this statute must prove that his termination "would not have taken place 'but for' [his] engagement in protected activity." 16 VAC 25-60-110(A).

As discussed previously, there is overwhelming evidence that Jeffrey and King terminated plaintiff for his unprofessional behavior toward other staff members and because of the confusion caused by his unauthorized directives to staff and inaccurate reports that his facility had no PPE. Again, in opposition to this argument, plaintiff cites only one (grammatically challenging) exchange from Jeffrey's deposition:

> Q: Where he was stating that he believed that there was inadequate PPE you believe was a misrepresentation and pulling other people away and that was one of the reasons why he was terminated?
>
> A: That was a factor.

Def. Ex. H (Jeffrey Tr.), [Dkt. No. 29-8] at 47:22-48:5. What plaintiff fails to acknowledge is that even in this exchange, Jeffrey agrees only that plaintiff's misrepresentations about PPE were a factor in his termination, not his concerns about having adequate protective gear. As Jeffrey explained in response to the question immediately before the one cited by plaintiff, plaintiff's "misrepresentation of PPE at our facility, caus[ed] multiple team members to have to actually

---

[2] Virginia Code § 40.1-51.2:2 requires that an employee bringing a claim under § 40.1-51.2:1 must first file an administrative complaint and receive a right to sue letter from the relevant state agency. Although plaintiff has not addressed this exhaustion requirement in his Complaint or his exhibits, the parties represented at the May 20, 2021 Final Pretrial Conference that he had exhausted all administrative remedies.

18

address that issue when there really wasn't an issue, [and] pull[ed] them away from potentially other serious situations." Id. at 47:16-21. Plaintiff's argument that he was fired for requesting adequate PPE is further undermined by the fact that each of his requests regarding the status of his protective gear—even those which prompted complaints about his demeanor and professionalism—also prompted efforts by management to secure the necessary equipment. See, e.g., Def. Ex. K, [Dkt. No. 29-11]; Def. Ex. A (King Decl.), [Dkt. No. 29-1] at ¶ 9; Def. Ex. O, [Dkt. No. 29-15]; Def. Ex. D (Clark Tr.), [Dkt. No. 29-4] at 68:9-11, 69:12-16.

As defendants correctly argue, "[a]lthough Mr. Clark's actions in requesting a mask and reporting concerns about the availability of PPE may amount to protected activity under Section 40.1-51.2:1, the manner in which he engaged in this activity is not protected." [Dkt. No. 29] at 27-28 (citing Weiters v. Roper Hospital, Inc., 58 F. App'x 40, 45 (4th Cir. 2003)) (emphasis in original). The evidence submitted by plaintiff, which consists primarily of his version of the events, does not create a material disputed factual issue as to the numerous complaints, from numerous coworkers, about his aggressive and belligerent behavior, including his unwillingness to listen to their responses without interrupting or criticizing them. These complaints were contemporaneously reported in emails generated by coworkers and supervisors to plaintiff's managers.

In addition, plaintiff's emails, in particular the one referring to the state COVID-19 criteria as "stupid" fully supports defendant's conclusion that plaintiff's employment was terminated not in retaliation for his engaging in protected activity, but for his unprofessional conduct, and there is insufficient evidence in this record on which a reasonable jury could find that defendants' explanations for firing plaintiff were pretextual.

19

## III. CONCLUSION

For the reasons stated in open court as further developed in this memorandum opinion, Defendants' Motion for Summary Judgment [Dkt. No. 28] has been granted.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record and to the Court of Appeals for the Fourth Circuit.

Entered this 18th day of August, 2021.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge